STATE of Utah, Plaintiff and
Respondent,

v.

James Murrell JONES, Defendant
and Appellant.

No. 17476.

Supreme Court of Utah.

Nov. 10, 1982.

Edward K. Brass, Salt Lake City, for defendant and appellant.

4. *Nelson v. Moriarty,* 484 F.2d 1034, 1035 (1st     Cir.1973). See also 8 A.L.R.3d 1100.

David L. Wilkinson, Atty. Gen., Salt Lake City, for plaintiff and respondent.

OAKS, Justice:

Defendant, a lawyer, was convicted by a jury on two counts of theft by deception in connection with his work as an employee of Global Marketing Services, Inc. (Global), a business that held itself out as a developer and marketer of inventions. He contends on appeal (1) that the evidence was insufficient, and (2) that the jury should have been instructed that reliance by the victim is a necessary element of the crime.

Our theft by deception statute states: "A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof." U.C.A., 1953, § 76–6–405(1).[1] Our aiding and abetting statute, § 76–2–202, provides:

> Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

The jury in this case was instructed in substantially the same language as these statutes.

### I.

In challenging the sufficiency of the evidence, defendant argues that there was no proof that he achieved a transfer of property to himself or Global, that he worked a deception, that he had a purpose to deprive the victims of their property permanently, or that there was any union of act and intent (because defendant's involvement did not occur until after the alleged victims paid their money). We test those contentions against the following evidence, viewed most favorably to the verdict of the jury. *State v. Forsyth,* Utah, 641 P.2d 1172, 1173 (1982).

Defendant was employed by Global on a part-time basis in the summer of 1977, and became a full-time salaried employee by November, 1977. The victims in this case were two of Global's clients, Covey and Brown.

Covey contacted Global in January, 1978, with an idea for an automatic cassette tape changer. He met defendant the following month. Covey testified that defendant told him Global had the ability "to have plans drawn up to do market research, to test the market, and to have a prototype built and this type things." Defendant also told Covey "about other products that they had that they were working on at that time," like a speedometer, a fuel-saving device and an electric car. Defendant showed him "new catalogues they were putting together to show new products, this type thing." Thereafter, on February 14, 1978, Covey signed a contract that was drafted and witnessed by defendant. In this contract, Global promised to obtain bids from manufacturers to produce Covey's invention, and to "use its best efforts, influence, and connections to help effect the marketing of the initial production units." Its promise to provide alternatives and suggestions for marketing included the cited possibilities (where deemed appropriate by Global) of "showing the product at upcoming marketing trips, nationwide press releases, trade shows, preparations of illustrations and prepared brochures." All of this was illustrative of Global's promise of a "best efforts approach to effect successful manufacturing, marketing and distribution" of Covey's product. Global also promised to "seek proposals and offers" from domestic and foreign "manufacturers, investors and distributors." "As deemed necessary," Global also promised to provide "tax suggestions" to

---

1. This crime is a felony of the second degree if the value of the property or services exceeds $1,000. § 76–6–412(1)(a)(i).

Covey, and "when deemed necessary by Global," to recommend revisions to improve the salability, safety, and packaging durability of the product, and to protect it by patents, copyrights, and trademarks.

On March 3, 1978, Covey paid Global $2,000 pursuant to the contract. Defendant gave him a receipt for that amount. Covey also testified that defendant's position as a lawyer had an effect on him, since he considered a lawyer "more reliable" than others. After Covey signed the contract, defendant told him that his product was being worked on, he and defendant met with an engineer to discuss building a prototype, and Covey saw some artwork on his product. No prototype was ever built, and Covey never received any royalties.

Brown contacted Global in the fall of 1977 with an idea for seminar presentations. Defendant was present for part of the first and subsequent meetings early in 1978, at each of which the marketability of Brown's product was discussed. Brown paid $500 as a deposit in February, and defendant gave him a receipt. Still, Brown was not yet willing to sign the contract or pay the balance of $4,500. Late in March, Global asked him to come to Salt Lake City from his home in Montrose, Colorado, to work out the details of a contract. He and his attorney met with defendant for that purpose. At this time, defendant signed and gave Brown a written progress report, which outlined Global's "preliminary work" on his project and made representations about Global's plans for marketing it.[2]

Thereafter, Brown signed the contract (dated Apr. 1, 1978) and paid the $4,500.

Defendant and one other officer signed for Global. The contract obligated Global for a one-year period to "promote, develop, organize and put in intelligible form, Client's concepts and ideas and copyright said materials and endeavor to publish those ideas in a marketable and profitable manner." Global agreed to prepare a full franchise agreement "to implement the marketing of seminars using Client's materials, ideas and likeness on first a regional and a national basis," and "to make available for contracting a minimum of one distributor per month ... to distribute Client's publications and materials," as well as to "book lecture tour commitments," including the first lecture within two weeks of the execution of the agreement. Global agreed "to guarantee a minimum of $5,000 in royalties, lecture fees, and other sources to the Client within twelve months of execution, or it will refund the difference."[3] Brown, the client, agreed to pay Global a total of $5,000, which he did. Global never fulfilled its commitments under the contract, and Brown received no monies under it.

Various witnesses testified to the general nature of Global's operation and defendant's knowledge of it. Defendant's secretary testified that in March, 1978, in response to her comment on the volume of angry mail Global was receiving, defendant stated, "Well, everyone knows we are running a scam up here."[4] Defendant's law clerk testified that in November of 1977 defendant stated that Global was a "front-end operation" which consisted of "bringing clients in the door to have them sign the

---

**2.** Defendant's progress report recited that Global's staff writer had completed her analysis, that Global had researched various convention dates for potential seminars and "can on the basis of its information project 24 seminars within the initial 12 month period" of the contract, with associated lectures "in almost all cases." The progress report stated that Global would retain a recording artist to do a one-hour tape of the substance of Brown's program, and "as to the deadlines of the performance contemplated ... pledge[d] that the first speaking engagement will be within the two-week period ...."

**3.** According to Brown, at one point—whether before or after he signed the contract is unclear—defendant told Brown that his invention "had a market potential in the first year somewhere around $200,000, I believe was the figure."

**4.** Under cross-examination, this witness admitted that defendant was given to exaggeration and overstatement, but, she also stated, "that was his basic tone for everything."

contracts and pay their money and that the operation was restricted to the front end." This witness also quoted defendant as saying about Global:

> There was nothing being done with respect to the back end of the operation which had to do with contacting manufacturers, actually doing the work to market the client's products and fulfilling the terms of the contract.

Defendant also said that Global's president "would be well advised if he would do something on the back end of the operation or he would be courting trouble." The law clerk also testified to a conversation with defendant in April of 1978, when she no longer worked for him, in which defendant referred to Global as "ripoff incorporated," and said, "We're fleecing people and taking lambs to slaughter." She described defendant's attitude as "just kind of like ho, ho, ho, this is what's happening and it's kind of funny . . . ."

Defendant's law clerk testified that at one point, when two of the company's executives were away, Global's full-time staff consisted of herself, defendant, his secretary, and a person whose job was to compile a list of potential clients. She knew of four consultants—an engineer, a market analyst, and two artists—but knew of no persons involved in marketing or sales on either a full- or part-time basis. Defendant's secretary from January through April, 1978, testified to a full-time staff of three people, including herself, plus a "clerical staff," part or all of which she believed to be part-time. During the period she worked there, she observed an engineering consultant two or three times and one artist. She knew of no salesmen or manufacturing representatives.[5]

Steven Mabey, Global's president, who had previously pleaded guilty to theft by deception in connection with his affiliation with Global and who had been sentenced to jail and required to make restitution for all client funds paid into the company, also testified. He recited a conversation in late February, 1978, in which defendant stated, "Why don't we turn on this machine and make our money and get out of this business as fast as we can." He also testified that in November, 1977, he and defendant discussed the fact that "about 90 percent of the products were not marketable, not of full marketable value." Defendant also stated, "I want my split of the money, $500 a month or more. I'll handle all of the litigation, the brunt of it and let's only put $50 per client into the ones that are really pressure clients, they're real hard clients."

Mabey also testified that defendant's "basic job was to keep the lawsuits down and complaints by trying to satisfy clients in any way that he could." In this connection, defendant recommended additional expenditures for artwork "to satisfy the clients so they wouldn't bring lawsuits or that he could get them off our back and stop causing us problems." In response to defendant's inquiries about "ways of keeping clients satisfied," Mabey suggested that Global might "give an advance royalty check to the client." Some royalties were paid to clients, but, Mabey said, "They were rare."

In sum, although Global did in fact do some limited artwork, engineering, and market research and paid "rare" royalties, during defendant's months with the company only a skeleton staff was employed (not including personnel for marketing), and no product was completely marketed.

■ In order to upset a jury verdict on appeal on the basis of insufficient evidence, the defendant must demonstrate "that the evidence was so inconclusive or insubstantial that reasonable minds must have entertained a reasonable doubt that the defend-

---

5. In contrast, in a letter to the Better Business Bureau in March, 1978, defendant stated that Global "retains on a continual basis a variety of over 300 consultants that work with the company in the capacities of marketing, engineering, finance, etc.," and that Global "offers over 50 different services . . . ."

ant committed the crime charged." *State v. Kerekes,* Utah, 622 P.2d 1161, 1168 (1980). Defendant has not made that demonstration on appeal in this case. The record evidence provides ample basis for defendant's conviction of the crime of theft by deception.

## II.

At trial, defendant requested the court to instruct the jury that in order to find him guilty of theft by deception they had to find that "any person who parted with money or property did so in reliance upon a misrepresentation of law or fact by the defendant." The court refused the instruction, and instructed the jury merely that conviction required finding that defendant "did obtain or exercise control over the property of [the victim]; ... by deception ...."

It is clear from the face of the statute that reliance by the victim is an element of the crime of theft by deception. In context, obtaining property "by deception" can only mean "by means of deception." Deception, followed by transfer of property to the deceiver, does not add up to theft by deception without the causal element of reliance. Even though the alleged victim is deceived, if he does not rely on the deception in parting with his property, there has been no theft "by deception." *State v. Vatsis,* 10 Utah 2d 244, 246–47, 351 P.2d 96, 97–98 (1960) (involving statutory predecessor of § 76–6–405(1), which also contained no express reference to "reliance"); *State v. Finch,* 223 Kan. 398, 573 P.2d 1048 (1978).

While we agree with defendant's argument that the requirement of reliance is self-evident on the face of the statute, we do not agree with his contention that this requirement must nevertheless be clarified by instructing the jury specially on reliance. This is not a case where the court failed to instruct accurately on all elements of the offense charged, an omission we have held to be reversible error. *State v. Laine,* Utah, 618 P.2d 33, 35 (1980). Here the court instructed the jury in the language of the statute, which, as we have held, included the requirement of reliance. The defendant was therefore free to pursue his theory by using his closing argument to the jury to urge that the State had not proved reliance. We cannot know whether he did so, since the closing arguments are not part of the record on appeal.

▬▬ Defendant implies that the court's refusal of his proposed instruction on reliance amounted to a ruling that reliance was not an element of the crime, which would have precluded defendant from pursuing this subject in closing argument. The record is silent on why the proposed instruction was refused,[6] just as it is silent on the content of the closing argument. In that circumstance, "we do not presume either error or prejudice." *State v. Hamilton,* 18 Utah 2d 234, 239, 419 P.2d 770, 773 (1966). The burden of showing error is on the party who seeks to upset the judgment. In the absence of record evidence to the contrary, we assume regularity in the proceedings below, and affirm the judgment. *State v. Norman,* Utah, 580 P.2d 237, 240 (1978); *State v. Kaae,* 30 Utah 2d 73, 513 P.2d 435 (1973); *Whetton v. Turner,* 28 Utah 2d 47, 497 P.2d 856 (1972); *State v. Hamilton, supra.*[7]

The judgment is affirmed.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, J., dissents.

This instruction could have been rejected as redundant. It could also have been rejected as misleading by stating that reliance was a requirement "in addition" to the previously defined elements of the offense.

**6.** Defendant's proposed instruction read:

In order to find the defendant guilty of theft by deception, you must find, in addition to the elements of the offense as I have previously defined them, that any person who parted with money or property did so in reliance upon a misrepresentation of law or fact by the defendant.

**7.** We make no ruling on defendant's third contention, that the court erred in refusing his request that he be sentenced for a misdemeanor rather than a felony, pursuant to U.C.A.,

1953, § 76–3–402(2). Without providing any reference to the lengthy record in this case, defendant asserts in his brief that the court denied this request on the basis that it had no power to impose a misdemeanor sentence for a felony of the second degree, a proposition defendant contests as a matter of statutory construction. But the record appears to be silent on whether the court denied defendant's request for the reason he claims or on the merits in the exercise of the court's broad discretion in sentencing matters.

Assertions of fact in a brief provide no basis for appellate review of a criminal conviction. Where there are two bases for an action by a trial court, one acceptable and one unacceptable, an appellate court obviously will assume that the lower court acted on the acceptable basis unless otherwise established in the record. Cases cited above.