STATE of Utah, Plaintiff and Respondent,

v.

Claude Donald HARMAN and Ralph Tolman, Defendants and Appellants.

No. 870290–CA.

Court of Appeals of Utah.

Jan. 10, 1989.

Edward K. Brass (argued), Salt Lake City, for defendants and appellants.

R. Paul Van Dam, State Atty. Gen., Dan R. Larsen (argued), Asst. Atty. Gen., for plaintiff and respondent.

Before GARFF, DAVIDSON and GREENWOOD, JJ.

OPINION

DAVIDSON, Judge:

Claude Donald Harman was indicted by a grand jury on numerous felony charges including conspiracy, tampering with a witness, and tampering with evidence. After trial, the jury returned a verdict of not guilty on the felony charges but guilty on the lesser included offense of attempted tampering with evidence, a violation of Utah Code Ann. § 76–8–510 (1978), a class A misdemeanor. Harman seeks reversal of that conviction claiming the evidence was insufficient to support the verdict. We reverse.

In May 1983, a fire caused extensive damage to the Fashion Place Plaza in Murray, Utah. At the time, the Salt Lake County's mental health department had its offices in the building. Dean Larsen, assistant chief of the Murray City Fire Department, began an immediate investigation into the cause and origin of the fire. The next morning, Larsen met with Evan Stephens, (Salt Lake County's risk manager) and Lou Midgley, deputy county attorney. At the meeting, Larsen stated that the fire had started in the mental health offices. Stephens testified that he thought such an opinion was premature especially since substantial county liability was possible. Stephens requested assistance in his investigation of the fire from the investigative division of the county attorney's office. The request was sent to Harman, who was then chief of the investigations division. Harman assigned Ralph Tolman and Olin Yearby to the case. Ralph Tolman and Dean Larsen were old friends.

Upon arrival at the scene, Tolman and Yearby met with Larsen, discussed Larsen's view of the origin of the fire, and then began digging through the rubble together. In spite of this joint activity, all three later testified that they each conducted an independent investigation. Larsen and Tolman became convinced that a space

heater and an electrical extension cord found in the mental health offices had been the cause of the fire.

Within a couple of days, Stephens and Midgeley became concerned that a truly independent investigator was needed. The county contracted with Jim Ashby of Global Investigations for that service. Harman was told of the new investigator but the evidence is conflicting whether Tolman and Yearby were to continue. It is clear that they stopped working on the case shortly thereafter.

Meanwhile, the space heater and the extension cord were sent for analysis. The laboratory report indicated that electrical current had not been present in either the heater or the cord when those objects burned. Ashby relied on this report in determining that the heater and cord could not have started the fire. He concluded the fire started in the roof above the mental health offices. Larsen disregarded the laboratory report and held firm in his earlier conclusion that the heater and cord had caused the fire.

Although both Larsen and Harman had been pressuring Tolman for his report, it was not written and submitted for approval until August. Both the laboratory report and Ashby's full investigation report preceeded Tolman's report. Tolman first submitted the report to his immediate supervisor, Sam Dawson, who rejected it. Tolman objected and demanded that it be sent to Harman, who received the report and also rejected it. In a heated discussion, Harman told Tolman to write a new report. Tolman did so but kept a copy of the first report in his investigation file and also gave a copy to the Murray City Fire Chief, Wendell Coombs. Also, Harman sent a copy of Tolman's first report to William Hyde, supervisor of the county attorney's civil division, and possibly several others.

In 1985, Larsen disclosed the existence of the first Tolman report during a deposition conducted pursuant to a civil suit over Salt Lake County's liability for the fire. An inquiry by the grand jury and this case followed.

On appeal, Harman questions the sufficiency of the evidence, the admission of certain hearsay evidence, and the refusal of his request for a bill of particulars. We find the first issue dispositive so we do not reach the others.

■■■ We may review the verdict of a jury in a criminal case and reverse as a matter of law if we find the evidence is insufficient. *See State v. Cantu,* 750 P.2d 591, 593 (Utah 1988). However, the standard for reversal is high. "We reverse ... only when the evidence ... is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime...." *State v. Petree,* 659 P.2d 443, 444 (Utah 1983). The weight and credibility to be given a witness is an exclusive function of the jury. *State v. Lamm,* 606 P.2d 229, 231 (Utah 1980). Furthermore, all evidence and reasonable inferences drawn therefrom must be reviewed in a light most favorable to the jury's verdict. *Petree,* 659 P.2d at 444.

Although this is a high standard, it is not insurmountable. We will not make "speculative leap[s] across ... remaining gap[s]" in the evidence. *Id.* at 445. Every element of the crime charged must be proven beyond a reasonable doubt. If the evidence does not support those elements, the verdict must fail.

Utah Code Ann. § 76–8–510(1) (1978) defines the crime of tampering with evidence. To be guilty, an actor must have altered, destroyed, concealed, or removed an item with the purpose to impair its verity or availability to a pending, or potential, official proceeding or investigation.[1] A person must have the same culpability to attempt to tamper with evidence. Utah Code Ann. § 76–4–101(1) (1978).

---

1. The full text of § 76–8–510(1) reads:

A person commits a felony of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:

(1) Alters, destroys, conceals, or removes anything with a purpose to impair its verity or availability in the proceeding or investigation....

We now consider the evidence presented in this case in a light most favorable to the jury's verdict. Harman was chief of the investigations division of the Salt Lake County Attorney's Office. Part of his duties were to review and approve or disapprove reports written by investigators. Reports could be rejected for content as well as form. Harman testified he thought Tolman's first report "parroted" Dean Larsen's opinion, contained unsupported factual assertions, and was a "bad report." Furthermore, at approximately the same time as Harman rejected the report, he told William Hyde and Lou Midgley about Tolman's opinion and gave a copy of the report to Hyde. Hyde, in turn, told the county commissioners about Tolman's opinion. Hyde and Midgley had requested the investigation in the first place and, at that time, were in charge of the county's defense of any liability claims arising from the fire. Copies of the report were kept in several files, including Hyde's case file and Tolman's investigative file. The documents in these files were available to the deputy county attorneys who responded to discovery and Hyde produced his copy of the Tolman report for the grand jury. There is no evidence that Harman made any attempt to alter, destroy or remove the report from these files or to influence others who knew of the report.

On the other hand, the prosecution introduced evidence that Harman had said that the report would make the county look bad, cost the county millions, and make the county liable.

In these circumstances, it became critical for the state to show that Harman's rejection of Tolman's report was improper. The state failed to do this. Culpability can be implied from the actions and statements of the defendant, but the evidence must be clear enough that the jury does not have to guess. We believe that the evidence of guilt was so slight, so conflicting, and so inherently improbable that reasonable minds could not have concluded that Harman rejected the report in an attempt to alter, destroy, conceal or remove it to impair its verity or availability, rather than rejecting it because it was a "bad report."

We, therefore, hold that the evidence was insufficient to establish the required mental state. Since the state failed to prove that critical element, Harman's conviction is reversed.

GARFF and GREENWOOD, JJ., concur.