STATE of Utah, Plaintiff and Appellee,

v.

Roger S. LeFEVRE, Defendant and Appellant.

No. 900159–CA.

Court of Appeals of Utah.

Jan. 15, 1992.

Craig S. Cook, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Christine Soltis, Salt Lake City, for plaintiff and appellee.

Before BENCH, P.J., and BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Defendant Roger S. LeFevre appeals his conviction for theft by deception, a second degree felony in violation of Utah Code Ann. § 76–6–405 (1990). Defendant challenges the lower court's denial of his motion for judgment of acquittal, claiming that the State failed to prove essential elements of its prima facie case. Further, defendant argues that there was insufficient evidence to sustain the jury's verdict. We affirm.

## BACKGROUND

This case revolves around a series of complex and rather amorphous financial transactions involving the defendant and two banks. Detailed explanations of banking methods and specialized banking terminology pervade the record, and the briefs of both parties pay substantial attention to the interplay of defendant's financial manipulations and the banks' account monitoring practices. However, as the facts crucial to this decision relate primarily to specific representations made by defendant to bank employees, and not to the intricacy of defendant's financial legerdemain, a cursory summary of the key facts will suffice.

In autumn of 1984, defendant managed and controlled two corporations in the Salt Lake area: Consolidated Companies, which was in the debt collection and real estate investment businesses, and Steelport Systems, which was engaged in the carport erection business. Consolidated had maintained its primary bank account at Zions First National Bank since 1981. Steelport had opened an account at First Interstate Bank in the spring of 1984. In September of 1984, eleven checks averaging $12,660 in amount were drawn on the Consolidated account at Zions Bank and deposited into the Steelport account at First Interstate. The transfer of funds from Consolidated to Steelport increased each month thereafter until, in May of 1985, forty-six checks averaging $75,667 were drawn on the Consolidated account. During that same period, Steelport issued almost exactly the same number of checks, in roughly the same amounts, to Consolidated. In total, Consolidated issued $14,367,370 in checks to Steelport in nine and one-half months, which were deposited to Steelport's account at First Interstate, while Steelport issued $14,408,768 in checks to Consolidated, which were deposited to Consolidated's Zions account. It is uncontroverted that neither Consolidated nor Steelport possessed the funds necessary to cover the checks drawn on their accounts.[1] Defendant designed and implemented a scheme through which illusory balances were main-

---

1. In fact, at the time in question Steelport was approaching bankruptcy.

tained in the two accounts, by making alternating deposits from each company's account into the account of the other.[2] Further, by continually increasing the number and amount of the checks, defendant was able to inflate the artificial balance in each account.[3]

Successful operation of the scheme required defendant to keep meticulous track of the recorded balances in the two accounts, to carefully calculate the amount of necessary deposits, and to make those deposits at the correct times. Further, because the scheme was designed to take advantage of each bank's pattern of crediting defendant's account as soon as checks were deposited, while the funds represented by those checks were still uncollected, the scheme was dependent upon each bank's consistent observance of that pattern. Due to either breakdowns in defendant's maintenance of the accounts, or a bank's failure to credit an account in the amount of an uncollected check, the scheme did not always work to perfection.

Marva Colby, the manager at the First Interstate bank where Steelport had its account, testified that in December of 1984 she grew concerned because a number of checks deposited into the Steelport account were being returned unpaid, due to insufficient balances in the Consolidated account on which the checks were drawn. Because these checks had been credited to the Steelport account while still uncollected, and defendant had already utilized the credit—either to cover checks written to Consolidated, or to make cash withdrawals—Zion's refusal to honor the checks meant that defendant had utilized funds that did not exist. As a result, an overdraft had developed in the Steelport account. Colby contacted defendant and requested that he provide compensating balances, i.e., collateral in the form of other accounts, to cover the overdraft should it not otherwise be discharged. At that time, defendant informed Ms. Colby he had obtained a $100,-000 line of credit from Zions Bank. At trial, Ms. Colby claimed that this representation made her "feel more comfortable

**2.** The defendant characterizes his actions as simply taking advantage of the two or three day period in which deposited checks are "uncollected"—that is, the "float" time between when a deposit is made and the actual sum is collected from the payor bank. A float occurs when a bank receiving a deposit credits the customer's account immediately, and allows the customer to use the money while the collection process is occurring. Check floating is a generally accepted practice among banks. Indeed, institutions generate revenue by charging customers "float fees" for using uncollected funds.

The State, however, labels the defendant's conduct a check "kite," in which simultaneous floats between two or more banks create what appears to be "collected funds" where none exist. The State further distinguishes the two practices by observing that "a kite is something that is done with an intent to make money that you [do not] have, whereas a float is [where] you [are] just using money you have for a little longer period of time." Whether the defendant's conduct constitutes a "float" or a "kite," it is clear his intentions were dishonest and resulted in both banks being misled about the true condition of the accounts. Defendant's claim that his manipulations simply accomplished a legitimate credit arrangement, albeit an unorthodox one, is untenable.

**3.** Although defendant's scheme did not work perfectly, the following hypothetical best explains the method by which defendant hoped—

and to a significant extent managed—to inflate the balances in the two accounts: On day 1 an individual opens an account in Bank A with a five dollar bill, and subsequently opens an account in Bank B with a $100.00 check drawn on Bank A. If Bank B is willing to credit the new account before Bank A honors the check, i.e., while the check is "uncollected," the combined balance of the two accounts is $105, even though there is only five dollars in real money between the two of them. On day 2, a $100 check drawn on Bank B is deposited into Bank A and a second $100 check drawn on Bank A is deposited into Bank B. Again, if the two banks are willing to credit the deposits immediately, and advance monies on the uncollected funds, the customer now has access to $305. On day 3, each account receives a $1000 check from the other bank. So long as each bank is again willing to advance monies on the uncollected funds, the customer now has access to $2,305—$1,105 from Bank A and $1,200 from Bank B.

Note also that if the two or three day "float" period for the first check (the $100 check from Bank A used to open the account at Bank B) ends on the third day, officials at Bank A will honor the check because the customer's Bank A account will have an apparent balance of $1,105.00. The $100 check will then become "collected" funds in the Bank B account, even though the customer's account at Bank A does not contain the "real" funds necessary to cover the check.

about paying checks" on uncollected funds because it caused her to believe that "if there was a problem [defendant] had that line of credit to draw the money from." At trial, the State adduced evidence which, while not wholly unchallenged, would support the conclusion that defendant had no such line of credit. Through conversations with defendant, Ms. Colby was also led to believe, apparently with regard to her periodic decisions whether Consolidated checks presented for deposit should be treated as cash items, that "there was plenty of money" in the Consolidated account.

Finally, in June of 1985, the house of cards collapsed when Zions refused to pay four Consolidated checks, made payable to Steelport and signed by defendant, totaling approximately $300,000. The checks were returned to First Interstate unpaid, whereupon Ms. Colby and her colleagues requested a meeting with defendant. When the dust settled, it was discovered that over the life of the Steelport account only about $288,500 in actual funds had been deposited into the account—all from sources other than Consolidated—while defendant had made approximately $529,600 in withdraw-

als. The difference between these two amounts, some $241,100, constituted a loss to First Interstate. This loss was attributable to the bank's consistent practice of crediting Steelport's account in the amount of checks issued to Steelport by Consolidated, before the funds represented by those checks were collected from Zions. The State contends that this practice had its genesis in defendant's misrepresentations.[4]

Defendant was originally charged with Communications Fraud under Utah Code Ann. § 76–10–1801 (1990), and Theft under Utah Code Ann. § 76–6–404 (1990). The circuit court dismissed the theft count after a preliminary hearing, but bound defendant over to the district court on the one remaining charge. The district court subsequently dismissed the Communications Fraud charge as violating the Ex Post Facto clause of the federal and Utah Constitutions.[5] The State then filed a new information in circuit court, charging defendant with Theft by Deception, a second degree felony in violation of section 76–6–405. Defendant was found guilty of that offense, sentenced to one to fifteen years in the

---

**4.** Defendant attributes the loss to the banks' failure to properly monitor the accounts, i.e., to their decisions to forego actual collection of the various checks before crediting the accounts. There is no question the accounts were monitored ineptly—Ms. Colby lost her job as a result of her poor business judgment in dealing with defendant. However, the Theft by Deception statute does not require the victim to have acted reasonably or with due diligence. *See State v. Schneider,* 148 Ariz. 441, 715 P.2d 297, 301 (App. 1985). Defendant's argument has the ring of "they should have saved me from myself." The ring is hollow. Inept account monitoring is no crime; dishonesty resulting in another's financial loss usually is.

**5.** United States Const. art. I, § 10; Utah Const. art. I, § 18. *See Dobbert v. Florida,* 432 U.S. 282, 292–93, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, *reh'g denied,* 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977); *State v. Fletcher,* 751 P.2d 822, 823–24 (Utah App.1988). The Communications Fraud statute was enacted by the Utah Legislature in 1985, subsequent to the events giving rise to the charges against defendant, and states in part:

> (1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of [communications fraud;]
>
> . . . .
>
> (3) Reliance on the part of any person is not a necessary element of the offense described in Subsection (1).

Utah Code Ann. § 76–10–1801 (1990).

Because it speaks of a "scheme or artifice" to defraud, and expressly eschews any requirement of reliance, the Communications Fraud statute appears better suited to defendant's conduct than does the Theft by Deception statute. Indeed, had the scheme in issue occurred after the Communications Fraud statute's enactment, the State may well have been required to proceed under section 76–10–1801. *State v. Hill,* 688 P.2d 450, 451 (Utah 1984) (when conduct can be construed as a violation of two overlapping statutes, the more specific statute governs). However, at the time of defendant's conduct, theft by deception was the most specifically applicable charge, and the subsequent enactment of section 76–10–1801 has no particular bearing on whether that conduct also violated section 76–6–405.

Utah State Prison, and ordered to pay restitution in the amount of $232,681.[6]

Defendant appeals his conviction on two main grounds. First, he argues that the trial court erred in failing to grant his motion for judgment of acquittal, as the prosecution failed to make a prima facie showing that he gained control of First Interstate's property "by deception." Second, defendant claims the evidence was insufficient to sustain the jury's verdict. Since, in this case, an affirmation of the jury verdict necessarily resolves the issue of whether the State established a prima facie case,[7] we consider only defendant's challenge to the sufficiency of the evidence supporting the verdict.

## STANDARD OF REVIEW

When reviewing challenges to the sufficiency of evidence to sustain a jury conviction, this court will reverse only when the evidence is "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt" as to the defendant's guilt. *State v. Harman,* 767 P.2d 567, 568 (Utah App.1989) (quoting *State v. Petree,* 659 P.2d 443, 444 (Utah 1983)). *Accord State v. Roberts,* 711 P.2d 235, 237 (Utah 1985); *State v. Lamm,* 606 P.2d 229, 231 (Utah 1980). Further, we will review all evidence and reasonable inferences in the light most favorable to the verdict. *State v. Petree,* 659 P.2d at 444. "Where there is any evidence, including reasonable inferences that can be drawn from it, from which findings of all the elements of the crime can be made beyond a reasonable doubt, our inquiry is complete and we will sustain the verdict." *State v. Gardner,* 789 P.2d 273, 285 (Utah 1989) (citations omitted).

## THEFT BY DECEPTION

■ Utah Code Ann. § 76–6–405 (1990) sets forth the statutory definition of theft by deception, and states:

(1) A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof.

(2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed. "Puffing" means an exaggerated commendation of wares or worth in communications addressed to the public or to a class or group.

Defendant challenges the verdict only insofar as the jury found he gained control of First Interstate's property "by deception," as the term is used in section 76–6–405. However, as is hereafter explained, three separate components of the "by deception" element are imbedded in that language: (1) that defendant's acts satisfied the statutory definition of deception, (2) that the deception occurred contemporaneously with the transaction in question, and (3) that the victim relied upon the deception, at least to some extent, in parting with property. Accordingly, we review the sufficiency of the evidence with regard to all three of these components.

### A. Existence of Statutory Deception

Utah Code Ann. § 76–6–401(5) (1990) defines deception and lists five circumstances in which deception may be found for purposes of section 76–6–405. In the instant case, the jury instruction was limited, without objection, to only one subsection of this provision:

"Deception" occurs when a person intentionally:

(a) Creates or confirms by words or conduct an impression of law or fact that is false and that the actor does not believe to be true and that is likely

---

6. The balance of First Interstate's loss had already been paid pursuant to a settlement agreement designed to conclude defendant's civil liability for the bank's loss.

7. All of the evidence upon which the jury verdict rests was presented in the State's case-in-chief. Accordingly, if we determine that sufficient evidence was presented at trial to affirm the jury verdict, we have necessarily found that the State established a prima facie case.

to affect the judgment of another in the transaction.

Utah Code Ann. § 76–6–401(5)(a) (1990).

After reviewing the trial record, we conclude the jury could have reasonably found defendant's representations concerning the $100,000 line of credit, and his assurances that there were adequate funds in the Consolidated account to cover the checks deposited in the Steelport account, both conformed to the statutory definition of deception.[8] The State introduced sufficient evidence showing these representations created or confirmed an impression of fact that was false, and that defendant knew to be false. Further, testimony revealed these statements were likely to affect the judgment of a bank official conducting business transactions with a customer making such statements.[9]

### B. Contemporaneousness of the Deception

In *State v. Lakey*, 659 P.2d 1061 (Utah 1983), the Utah Supreme Court held that the use of the present tense in § 76–6–401(5)(a) limits the section's application to impressions of fact that are false "when the defendant created or confirmed the impression for the purpose of affecting the judgement of another in the transaction." *Id.* at 1063. In other words, the deception must exist at the time of the transaction. *See State v. Droddy*, 702 P.2d 111, 113 (Utah 1985) (per curiam).

In *Lakey*, the defendant purchased goods with a personal check but asked the seller not to cash the check that day, as the defendant had to make a deposit into the account before the check would clear. The seller agreed not to cash the check until the following Monday. When the seller tried to cash the check, it was dishonored, and the defendant was convicted of theft by deception. The Supreme Court reversed, holding "there was insufficient evidence that [Lakey] had created, confirmed, or failed to correct a false impression of fact as to the sufficiency of his bank balance *at the time he issued the check and obtained the property*." *Lakey*, 659 P.2d at 1063 (emphasis added). *See Droddy*, 702 P.2d at 113. The Court reasoned that, since the seller knew the defendant had insufficient funds in his account at the time he sold him the goods, the deception did not exist at the time of the transaction. The defendant's statement could not become false until a future time, i.e., the following Monday, and therefore could not be the basis for a conviction under the statute.

In the instant case, however, defendant's representations were false at the time he made them to First Interstate. In December of 1984, defendant did not tell Ms. Colby he would soon have enough money in the Consolidated account; he told her he had enough money at that time. He did not state he would soon be approved for a line of credit at Zions Bank; he said he had already received one. This is sufficient evidence to support a determination that the deception existed at the time of the transactions.

### C. Reliance Upon the Deception

Neither section 76–6–405 nor section 76–6–401 requires, in so many words, that the State show the victim relied upon the defendant's deception. Nonetheless, courts have generally treated reliance as an implicit element of the offense of theft by deception, i.e., theft *by means of* deception. As the Utah Supreme Court reasoned in *State v. Jones*, 657 P.2d 1263 (Utah 1982),

> [i]t is clear from the face of the statute that reliance by the victim is an element

---

8. Other alleged instances of deception are debated in the briefs. In view of our resolution, it is not necessary to consider them.

9. It should be noted that this requirement involves a completely separate inquiry from that used to determine the victim's reliance. The sole purpose of section 76–6–401 is to define those words or actions that may be considered a "deception." As such, the language "and is like-ly to affect the judgment of another in the transaction" is meant only to test the relationship between the falsehood and the transaction, so as to determine if a deception exists. If a deception is found, it must then be considered whether there was reliance, i.e., whether obtaining or improperly controlling another's property was accomplished "by deception."

of the crime of theft by deception. In context, obtaining property "by deception" can only mean "by means of deception." Deception, followed by transfer of property to the deceiver, does not add up to theft by deception without the causal element of reliance. Even though the alleged victim is deceived, if he does not rely on the deception in parting with his property, there has been no theft "by deception."

*Id.* at 1267. *See also State v. Finch*, 223 Kan. 398, 573 P.2d 1048, 1052 (1978) (cited favorably by the Utah Supreme Court in *Jones*). What *level* of reliance must be shown is the real issue.

In *State v. Schneider*, 715 P.2d 297 (Ariz.App.1986), the court adopted a "materiality" test for reliance, stating:

> The deceit must be "material" to constitute the offense, in the sense that it must be a significant factor in the transaction.... Materiality seems to require that the victim to some extent must believe the pretense to be true, but the greater focus is the objective issue of whether the misrepresentation was instrumental in effecting transfer of [property].

*Id.* at 300 (*quoting* R. Gerber, Criminal Law of Arizona 249 (1978)). According to this standard, the misrepresentation does not have to be the only, or even the controlling, factor in the victim's decision to part with his or her property. Instead, the *Schneider* test appears to permit a finding

of sufficient reliance so long as the defendant's misrepresentation constituted a substantial causal influence upon the victim's decision, i.e., if the victim believed the misrepresentation to be true, and included it as a factor in the decision-making process.[10]

No prior Utah case has specifically considered the minimum level of reliance necessary for a theft by deception conviction. However, at least one opinion has found sufficient a level of reliance similar to that required by the *Schneider* test. *See State v. Roberts*, 711 P.2d 235, 238 (Utah 1985) (reliance requirement satisfied by evidence "clearly support[ing] the conclusion that defendant's representations ... affected [the victim's] judgment ... and were in fact fundamental to the transaction"). Further, no Utah cases have found *Schneider*-level reliance to be insufficient.[11]

We conclude the *Schneider* test establishes the appropriate level of reliance necessary to sustain a conviction for theft by deception. Further, in situations where the deception consists of a series of misrepresentations, we decline to require that each false statement or act conform to the test; the victim need only have materially relied on the resulting deception. "The offense of theft by deception is plainly intended to protect unwary members of the public from a broad range of fraudulent or deceptive schemes." *Linne v. State*, 674 P.2d 1345, 1353 (Alaska App.1983). We believe the standard of reliance we have set best

**10.** This interpretation is bolstered by case law defining both "material" and "instrumental" outside of the reliance context. *See, e.g., Hartz v. Sobel*, 136 Ga. 565, 71 S.E. 995, 1001 (1911) ("material" does not mean essential, but means important, more or less necessary, going to the merits, having to do with the matter); *Albert v. Maher Bros. Transfer Co.*, 215 Iowa 197, 243 N.W. 561, 563 (1932) ("instrumental" has the same meaning as "contributing"); *Culp v. Browne*, 235 S.W. 675, 678 (Tex.Civ.App.1921) ("instrumental" defined as "serviceable or helpful"). Black's Law Dictionary (5th ed. 1979) sets forth the following definitions: "Material: Important, more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is 'material'." *Id.* at 980. "Instru-

mental: Serviceable, helpful; serving as a means or agent; something by which an end is achieved." *Id.* at 720.

**11.** No Utah case has expressly required a victim to demonstrate "but for" reliance. Opinions that have found such reliance within the factual context of a particular case, although quick to announce its presence, nonetheless seem to rely on it as conclusive evidence of reliance rather than equating it with the level of reliance minimally required to sustain a conviction. *See, e.g., State v. Noren*, 704 P.2d 568, 569 (Utah 1985) (per curiam) ("[the victim] would not have ... agreed [to take out the loan] had he known about the prior sale"); *State v. Forshee*, 588 P.2d 181, 183 (Utah 1978) (the victim "also testified that he would not have purchased the car" absent the defendant's deception).

promotes this policy while ensuring that truly innocent conduct will not be punished.

■ Applying the above analysis to the facts of the instant case, we hold that sufficient evidence was presented to support the jury's finding of actual reliance. In December of 1984, Ms. Colby was very concerned about the state of the Steelport account. The account was in overdraft, the majority of the checks deposited into the account were drawn from another company with which defendant was involved, and a significant number of those checks had been returned unpaid. Given these circumstances, Ms. Colby's statement that defendant's representations made her feel "more comfortable" constitutes sufficient evidence from which the jury could reasonably infer that the deception was a substantial causal influence upon her periodic decisions thereafter to pay Steelport checks, notwithstanding uncollected funds, and to credit defendant's account before funds deposited from Consolidated were collected.

The position expressed by Judge Bench in his separate opinion, that actual reliance at any level is not an element of theft by deception, is untenable for two reasons. First, his interpretation could easily result in convictions where no harm has occurred. For instance, consider a car seller who deceptively represents an automobile as having only been driven twenty thousand miles, the mileage shown by the odometer. A prospective buyer, knowledgeable in auto mechanics, looks under the hood and immediately realizes that the car has at least eighty thousand miles on it. Despite this realization, he considers the car a "classic" and pays the seller's price, which he regards as fair regardless of the actual mileage.

Because the false statement was of the type *likely* to affect the judgment of the buyer, Judge Bench would apparently convict the seller of theft by deception even though the deception played no role in the buyer's decision to purchase the automobile. Indeed, despite the seller's effort to the contrary, the buyer was not deceived at all. We find such a result bizarre.

Second, Judge Bench's apparent view of the decision in *State v. Jones,* 657 P.2d 1263 (Utah 1982), is difficult to understand. Judge Bench seems to question whether *Jones* expressly required actual reliance as an element of the offense, stating that the Court "did seem to indicate ... that there is a requirement of reliance." We view statements in *Jones* such as "if [the victim] does not rely on the deception in parting with his property, there has been no theft 'by deception'" as beyond a mere "indication" of the Utah Supreme Court's intention to require some level of reliance by the victim. Further, Judge Bench takes comfort in the fact that *Jones* does not expressly define "deception". We believe the Court's failure to define that term is irrelevant to its determination that, for theft by deception to occur, the victim must *rely* on the deception, however deception may be defined.

A situation in which a deception is made, but not relied upon by the victim at all, is at most "attempted theft by deception." Because Utah Code Ann. § 76–4–101 (1990) provides for such an offense, there is no reason to enlarge the scope of the Theft By Deception statute to include situations where theft by deception might have happened, but, because of the victim's lack of reliance on the perpetrator's deception, did not occur.

## CONCLUSION

The State presented sufficient evidence in its case-in-chief to sustain the jury's verdict. The verdict is therefore affirmed.

BILLINGS, J., concurs.

BENCH, Presiding Judge (concurring in the result):

I disagree with the majority's legal analysis requiring the State to prove actual reliance by the victim. The plain and unambiguous language of the statute creates a "likely" reliance test rather than an "actual" reliance test. If the definition of "deception" given in section 76–6–401(5) is plugged into section 76–6–405, the following definition of theft by deception emerges (with grammatical reconciliation):

A person commits theft if he obtains or exercises control over property of another by intentionally creating or confirming by words or conduct an impression of law or fact that is false ... *that is likely to affect the judgment of another in the transaction.*

As defined by the legislature, deception is the making of an impression that is *likely* to affect the judgment of another. The state need not prove actual reliance in order to satisfy the statute.

The majority even acknowledges that the statute does not require actual reliance, but rewrites the statute to include such a requirement. *State v. Roberts*, 711 P.2d 235, 238 (Utah 1985), does not support the majority's lawmaking approach.[1] The supreme court simply held in *Roberts* that the requirement that the misrepresentation be likely to affect the judgment of the victim was satisfied by evidence that the victim in fact relied upon the misrepresentations. The fact that evidence in a given case happens to satisfy both a higher standard of proof, i.e., actual reliance, and a lower standard of proof mandated by the statute, i.e., likely reliance, does not create a requirement that the state must satisfy the higher standard in every case.

The supreme court did seem to indicate in *State v. Jones*, 657 P.2d 1263 (Utah 1982), that there is a requirement of reliance, but the court did not expressly address the "likely reliance" definition of deception.[2] The supreme court's use of the phrase "by means of deception" in *Jones* does not create the additional element of actual reliance since the legislature has defined "deception" as merely the creation of an impression likely to cause reliance. Therefore, the requirement that property be obtained by means of deception is satisfied if the defendant obtained the property by means of creating a false impression likely to affect the victim's judgment.

Once the State has shown the creation of a false impression in a given transaction, that is all the proof required to prove the conduct declared to be criminal by the Legislature. There is no need for the State to prove that the victim's judgment was actually affected by any false impression in order to show theft by deception as defined by the Legislature. Cf. *State v. Facer*, 552 P.2d 110, 111 (Utah 1976) ("a scheme to defraud does not need to come to fruition in order to complete the crime.").

The majority faults this interpretation for the "bizarre result" that convictions may occur where no harm has occurred. It is not my interpretation of the statute that creates such a possibility, it is the statute itself. This is not the only crime involving misrepresentation where the legislature has opted not to require actual reliance. *See, e.g.*, Utah Code Ann. § 76–10–1801 (1990). While requiring actual reliance might have been a better approach, the Legislature chose not to take such an approach. We must respect its decision. I therefore respectfully decline to join in the majority's legal analysis on that point.

Finally, it is to be noted that the majority has not identified any evidence of actual reliance. Under the majority's analysis, if there is not sufficient evidence of actual reliance then defendant's conviction should be reversed. I concur in affirming defendant's conviction, however, because the "likely" reliance standard of proof was clearly met.

---

1. *State v. Schneider*, 715 P.2d 297 (Ariz.App. 1986), and other cases not interpreting Utah's statute are clearly distinguishable. The fact that other states may have implied an actual reliance element does not justify our selection of an actual reliance element when the legislature has clearly selected a likely reliance standard.

2. We may not speculate whether the supreme court actually considered an apparent issue not addressed in an opinion. *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 683 (Utah 1985). *Jones* is therefore not binding as to any point not expressly addressed therein.