**Mary MARCHESE, Frank Marchese, Rosemary Marchese Klay, and Kent Minor, Plaintiffs,**

**v.**

**Karl NELSON, Main Street Securities, Inc., and Equity One, Inc., Defendants.**

**Civ. No. 88–C–614A.**

United States District Court, D. Utah, C.D.

Jan. 6, 1993.

See also 700 F.Supp. 522.

Jeffrey B. Brown, Brown and Brown, Salt Lake City, UT, for plaintiffs.

Wallace Boyack, Salt Lake City, UT, for defendant Nelson.

Bruce L. Dibb, of Jensen, Duffin, Carman, Dibb & Jackson, Salt Lake City, UT, for defendant Equity One, Inc.

Thomas R. Blonquist, of Salt Lake City, UT, for defendant Main Street Securities, Inc.

## MEMORANDUM DECISION IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALDON J. ANDERSON, Senior District Judge.

On July 6 and 7, 1992, the court tried Plaintiffs' securities fraud claims. After hearing the testimony and assessing the evidence, the court took the matter under advisement. Jeffrey B. Brown of Brown & Brown in Salt Lake City, Utah, tried the matter on behalf of the Plaintiffs Mary Marchese, Frank Marchese, Mary Marchese Orbegoso, and Kent Minor. Wallace Boyack of Salt Lake City, Utah, represented Defendant Karl Nelson. Not appearing at trial were Bruce L. Dibb of Jensen, Duffin, Carman, Dibb & Jackson in Salt Lake City, Utah, counsel for Defendant Equity One, Inc. and Thomas R. Blonquist of Salt Lake City, Utah, counsel for Defendant Main Street Securities, Inc.[1] Having reviewed the record and the applicable law, the court, pursuant to Federal Rule of Civil Procedure 52(a), issues the following memorandum decision in lieu of findings of fact and conclusions of law.

## I. BACKGROUND

This claim involves plaintiffs' investment in speculative over-the-counter stocks which resulted in substantial loss to each plaintiff. Plaintiffs allege that Defendants' conduct in these stock transactions constituted a violation of Rule 10–5, 17 C.F.R. § 240.10b–5; common law fraud; negligent misrepresentation; and breach of fiduciary duty. The allegations center on the conduct of stock salesperson, Defendant Karl Nelson, who was involved in the disputed transactions.

Nelson, a lifelong resident of Salt Lake, holds a Bachelor's degree and an M.B.A. from area universities. Nelson, a registered securities dealer, has been involved in stock sales for nearly ten years, working first for Defendant Main Street Securities, then for Defendant Equity One, and now with a national investment firm. The disputed transactions took place in 1984 and 1985, a time early in Nelson's professional career.

Plaintiffs are residents of Illinois who have little background in over-the-counter stock. Plaintiff Kent Minor is a thirty-seven year old music teacher living in Berwyn, Illinois, whose only experience with securities investment was his involvement in the disputed transactions. Mary Marchese, a homemaker living in Downer's Grove, Illinois, attended college for one year and studied art education, but has never taken a business course. She has no investment or money management background, other than an Individual Retirement Account managed by a national brokerage. Mary Marchese invested in the disputed transaction not only for herself, but also for her daughter Plaintiff Rosemary Marchese Orbegoso, formerly Rosemary Marchese Klay. Orbegoso did not testify at trial, but her mother, Mary Marchese, offered testimony concerning Orbegoso's background. Orbegoso is a postal carrier living in Glen Ellyn, Illinois, who, at the time of the disputed transactions, was a twenty-one year old art student. Plaintiff Frank Marchese, the son of Mary Marchese, is a dentist, educated at the University of Illinois. Prior to and after the disputed transactions, Frank Marchese has invested in securities. Although not holding a degree in business, he previously took an economics course. Thus, Plaintiffs all have some college education, but have little background in the

[1]. Mr. Dibb notified the court by letter that his client, Equity One Securities, would not participate in the trial, but rather, because its maximum liability was $3,200, would accept a default judgment. Mr. Blonquist, counsel for Main Street Securities, similarly informed the court that he would not appear. Although his client will accept the judgment of the court, it is unwilling to accept a default judgment.

type of stock transactions which are at the core of this litigation.

Investment in the business of a mutual friend brought Plaintiffs into contact with Defendant Karl Nelson in 1984. Plaintiff Minor conversed with a friend, Jim Thompson, during 1983. Thompson was excited about a company, EAC, which was marketing an invention of his and which was soon expected to have a public stock offering. Thompson encouraged Minor to invest in EAC, and Minor, willing to help a friend, contacted Main Street Securities, the underwriter of the expected EAC public offering,[2] in early 1984. Main Street, in turn, referred Minor to its salesperson, Karl Nelson. At this time a public offering of EAC was anticipated; therefore, on advice from Nelson, Minor set up a trust account with Main Street in which Minor's funds would be safeguarded until EAC's public offering. By August 1984, Main Street had abandoned plans to publicly offer EAC. Minor had invested $2000 in April 1984 in an interest bearing trust account.

When Nelson informed Minor in August 1984 that EAC would not go public, he suggested other stocks that would do just as well as EAC. Nelson represented that these investments were "hot deals" that could do as well as a money market account. Although Nelson never used the word guarantee during their discussions, Minor understood Nelson to guarantee a rate of return at least equal to money market rates. Trusting Nelson, Minor authorized Nelson to purchase two over-the-counter stocks, CES and Spectratek, for his account.

Because Minor had given Main Street his brother's New York address, Minor did not receive his first statement until April 1985. By this time, Minor's account had dwindled to $1255.91, $744.09 less than Minor's initial investment. Pl.'s Ex. 7 at 2. After receiving this statement, Minor conversed with Nelson for the first time concerning the value of his stock. Nelson acknowledged that the value of the stock had dropped.

When Minor received his July 1985 statement, he realized that his stock had continued to drop in value. Again, he called Nelson, who again acknowledged that there had been some market fluctuation and that such speculative stock could go up or down in value. Later that month, Minor tried to close his trust account, but was informed that it would cost $120 to close and liquidate the account. Minor chose not to close the account. Of his initial $2000 investment, Minor now has valueless stock certificates and no money.

Plaintiff Frank Marchese learned of EAC from Minor. Hearing Minor's enthusiasm about EAC, Frank Marchese contacted Jim Thompson, who satisfied Frank that EAC would be a profitable investment. Shortly thereafter, in April 1984, Frank Marchese contacted Nelson at Main Street Securities. Upon Nelson's urging that EAC would make a surge or dramatic jump after its initial offering, Frank Marchese rushed money to open a trust account. During May and June 1984, Frank Marchese placed $3083.03 in an interest bearing trust account. Pl.'s Ex. 49 at 1. Like Minor, Frank Marchese, at Nelson's request, had supplied a false address: the Orodale, New Jersey address of his dental assistant's parents. Frank Marchese made no arrangements to have his statements forwarded to him.

Nelson advised Frank Marchese in July 1984 that EAC would not go public, but that other stock was available that could do as well as EAC or 10% money market

---

**2.** In preparing for the EAC public offering, Main Street had not obtained approval from the state of Illinois. Accordingly, Main Street could not legally sell EAC stock to residents of Illinois. To circumvent this problem when customers from states such as Illinois which had not approved EAC sought to invest in EAC, Main Street instructed its sales people to list an erroneous address. Nelson admitted that Main Street followed this practice specifically to circumvent the laws of a state such as Illinois that had not approved EAC. Nelson did this with Plaintiffs. Consequently, Plaintiffs listed addresses in New Jersey or New York with Main Street securities. Although not having a bearing on EAC stock, the erroneous addresses would later create problems for Plaintiffs.

rates.[3] Frank Marchese did not purchase any stock at this time. The following month, August 1984, after Nelson again urged Frank Marchese that stock as good as or better than EAC or the money market was available, Frank Marchese purchased shares of CES. The following week, Frank Marchese purchased shares of Spectratek. Of his initial $3093 investment, Frank Marchese purchased $1088 worth of CES and $980 worth of Spectratek. Pl.'s Ex. 49 at 7.

In November 1984, Frank Marchese received his first statement concerning his stocks. This was the September statement, which indicated that his initial $2068 investment in CES and Spectratek had dwindled to $400. Pl.'s Ex. 49 at p. 3. Frank Marchese understood from reading the statement that the value of his stock had gone down. Understandably concerned, Frank Marchese called Nelson. Nelson explained the variance between buy and sell prices and quote and ask prices in stock, but Frank testified that he did not understand this discussion. Although Nelson attempted to explain the nuances of stock transactions, he never told Frank Marchese that he was losing money. Rather, Nelson assured Frank that his account was about even and was doing fine.

The following month, December 1984, Frank Marchese again spoke with Nelson who told Frank that his stock was making money. Again, Nelson did not tell Frank how much he was making. The December 1984 statement, which Frank Marchese received on time, showed an account value for the pertinent stock of $400. Pl.'s Ex. 49 at 4. In January 1985, Nelson moved from Main Street Securities to Equity One. In a January 17, 1985 letter, Nelson informed Frank Marchese that his accounts were doing fine and would continue to progress. Frank understood this to mean that his specific stocks were performing well, although Nelson explained that this was a letter sent to all his clients and that the statement merely was intended to convey general information about the potential of the industry and of companies within that industry. Frank Marchese's statement for the period ending March 31, 1985, showed an account value for the pertinent stock of $1100: $800 for CES and $300 for Spectratek. Pl.'s Ex. 49 at 6.

It was not until ten months later, October 1985, when his mother Mary Marchese liquidated her account, that Frank Marchese realized that his stock was not performing. Alarmed at his mother's report, Frank Marchese telephoned Nelson and asked about the value of his account. Nelson did not satisfactorily answer the question, but rather indicated that Frank's accounts were about the same. Then, for the first time, Frank Marchese pressed Nelson for the exact figures. Nelson indicated that Frank Marchese's initial investment of $5000 had dwindled to about $3000.[4]

Frank Marchese confronted Nelson for misleading him and demanded his money. Nelson apologized for the loss[5] and indicated that, if Frank Marchese would let him trade for another week, he could recover most of the loss. Nelson refused to put this in writing. Frank Marchese initially consented to Nelson's offer, but two days later, called Nelson and demanded that Nelson cease trading and transfer his remaining funds to a money market account. During this two day period, there was substantial activity in Frank Marchese's account. Frank Marchese's shares of CES were sold on October 22. The same day shares of LA Med Tech were purchased for his account. These shares along with Frank Marchese's shares of VET were sold on October 25, 1985.

3. Frank initially testified that Nelson indicated that the other stock would do as well as EAC or money market rates. When pressed on cross-examination and later on re-cross-examination, Frank conceded that Nelson said the other stock *could* do as well as EAC or the money market.

4. Frank's investments with Nelson totalled approximately $5000; however, only his initial investment of $3093 in Spectratek and CES is before the court.

5. Frank Marchese assumed that Nelson was apologizing because he was responsible for Frank's loss. Nelson, however, clarified that he merely was expressing his concern that Marchese's stock had decreased in value, rather than his responsibility for the loss.

The facts are substantially similar in the case of plaintiffs Mary Marchese and Rosemary Marchese Orbegoso. In May 1984, Mary Marchese learned of EAC from her son Frank, who indicated that it would be a good investment opportunity. Like the other plaintiffs, Mary Marchese called Nelson, who informed her that EAC would soon go public. Consequently, during May and June 1984, she placed $3347.90 from an account with another brokerage into an interest bearing trust. Pl.'s Ex. 31 at 1. As with Minor and Frank Marchese, she too was advised that Illinois residents could not invest in EAC; therefore, on advice from Nelson, she provided the same New Jersey address used by her son Frank.[6] As with the other Plaintiffs, because of the address problem, she did not receive her first statement until much later, in her case, March 1985.

In August 1984, Mary Marchese learned that EAC would not go public. At this time, Nelson informed Mary Marchese of other available stock. Although he did not guarantee a return, he indicated that it could do better than the money market. He advised Mary Marchese to buy and specifically mentioned the two pertinent stocks, CES and Spectratek. He related that CES was an energy company like EAC, but did not compare Spectratek with EAC. In late August 1984, after some consideration, Mary Marchese purchased $1088 of CES and $980 of Spectratek for her account, Pl.'s Ex. 31 at 2, and with her daughter Rosemary Orbegoso's consent, also invested $2015 of Rosemary's money to purchase shares of these two stocks, Pl.'s Ex. 1 at 3.

In October 1984, Mary Marchese called Nelson to check how her investments were doing. Nelson assured her that they were making money and doing well. A similar conversation occurred in January 1985. Mary was so pleased with these reports that she invested an additional $3200 in Victory Enterprises Technology ("VET"). Pl.'s Ex. 31 at 4. In effectuating the VET sale, Nelson made no comparisons, gave no guarantees, and made no representations that the stock was "hot on the market."

When Mary Marchese received her first statement, in March 1985, she was surprised, after investing $5268, to find an account balance of $3217.60. *Id.* She did not understand the statement, nor did she contact Nelson for an explanation. With this statement and with the others she would thereafter receive, she assumed that the balance indicated was the amount that she had made over her original investment. Later, in June 1985, Nelson and Mary Marchese discussed her investments. During this conversation, Nelson gave Mary Marchese quotes on her stocks, but did not explain that the value of her account had declined.

In August 1985, Rosemary liquidated her account. The liquidation check, for $514.08 came to Mary Marchese. Although she was concerned at the amount, Mary Marchese assumed that it was a dividend or interest, and therefore, did not pursue the matter with Nelson. In September 1985, Mary Marchese received a statement showing an account balance of $1716.61. She was concerned that her $5300 investment had dwindled, but was assured by Nelson that her account was doing well. Finally, in October 1985, Nelson informed Mary Marchese that her account had lost money because of a reverse ten-to-one split. Shortly thereafter, she closed her account and informed her son, Frank, of the problem.

Nelson is adamant that he did not knowingly defraud Plaintiffs, and that he never intended to misrepresent the status of Plaintiffs' accounts. However, his conduct with each plaintiff suggests a consistent pattern. Willing to make a sale, Nelson contacted each plaintiff to explain that EAC would not go public and to suggest other similar stock. As was his usual practice, Nelson described the stock, explained the risk involved and the volatility of over-the-counter stock, and urged that because of this volatility and risk, Plaintiffs diversify. Nelson suggested that the stocks were in hot industries, or industries that were

---

**6.** On her daughter Rosemary's behalf and with Rosemary's consent, Mary also opened a trust account for Rosemary with $2000 of Rosemary's money.

surging and that similar stock had done as well as the money market.[7] Sensing that Plaintiffs were interested in the energy industry, Nelson recommended CES, but to diversify their portfolios, he also suggested Spectratek.[8] After making the sales, Nelson conversed with Plaintiffs concerning their accounts and how to read their statements.[9] Through this course of dealing, however, Nelson never directly provided the value of Plaintiffs' accounts.[10] Ultimately, however, Nelson admitted that it was his duty to make sure his clients understood what they were doing and were informed of the value of their stock.

## II. DISCUSSION

### A. Violation of Federal Securities Law

Plaintiffs claim that they are entitled to damages because Defendants violated section 10(b) of the Securities and Exchange Act of 1934 [11] and Rule 10b–5 [12] promulgat-

ed thereunder. This court has previously set forth the elements of a Rule 10b–5 claim:

> The essential elements of a Section 10(b) or Rule 10b–5 claim for damages are: (1) damage to the plaintiff; (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud, (3) made with an intent to deceive, manipulate or defraud, (4) in connection with the purchase or sale of securities and (5) furthered by defendant's use of the mails or facilities of interstate commerce.

*Lochhead v. Alacano*, 697 F.Supp. 406, 414 n. 4 (D.Utah 1988) (citation omitted).

Plaintiffs track the elements of the statute, alleging that Nelson used an instrument of interstate commerce, the telephone, in connection with the sale of the pertinent over-the-counter stock and that Nelson, in order to induce the sales, knowingly misrepresented material facts on

---

7. Plaintiffs' confusion over Nelson's representations is easily understood given their inexperience and Nelson's cryptic references.

8. Nelson's former supervisor, William Clark, president of Equity One, and Walter E. Heyman, former president of Main Street Securities, indicated that in the years Nelson worked for Main Street, the plaintiffs' action was the only complaint about Nelson. Clark admitted, however, that the majority of the 12,000 accounts handled by Equity One has a value of about $7000 and that many investors may not have the financial means to seek relief in the manner that the plaintiffs have.

Heyman spoke of the training received and procedures followed by Main Street's stock sales people. His testimony bears out much of what Nelson said: that brokers should never guarantee results or project where a given stock would go. To this end, the brokers were trained not to compare stocks, even those in the same industry such as CES and EAC and especially differing investments like stock and the money market, and not to suggest results by implying the stock was hot on the market.

9. Nelson explained to his clients the difference between the bid price and the ask price and how each are calculated. The bid price is what the prospective buyer is willing to pay for the stock; the ask price is what the buyer actually pays for the stock.

10. Mr. Heyman trained his sales people to provide bid and ask price, in response to a customer inquiry concerning account value.

11. Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1988).

12. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1991), provides:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

which the Plaintiffs relied. There is no argument that Nelson used the telephone, an instrumentality of interstate commerce, in his relationship with the Plaintiffs. Therefore, the pertinent inquiries are whether Nelson knowingly misrepresented material facts in connection with the purchase and sale of securities, and whether Plaintiffs justifiably relied on these representations.

Plaintiffs contend that the following three statements of Nelson constitute misrepresentations: (1) Nelson's statements that the Plaintiffs' stock was just as good as EAC, was hot on the market, and could do as well as the money market;[13] (2) Nelson's letter of January 1985 which indicates that Plaintiffs' stock was doing fine and progressing; and (3) Nelson's telephone conversations with Plaintiffs in which he purportedly suggested that their stock was doing fine and making money.[14] These statements must be overlaid on the two pertinent sales: (1) in 1984, when the Plaintiffs purchased CES and Spectratek; and (2) in 1985, when Mary Marchese purchased VET.

■ Initially, the court must determine whether any of the above-alleged misrepresentations were made in connection with the purchase or sale of Plaintiffs' stock. The language of the statute contemplates a broad reading of the terms purchase and sale. *See Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731, 738 (10th Cir.1974). Congress intended that "the words 'purchase' and 'sale' are not limited to transactions ordinarily governed by the commercial law of sales." *Id.* at 739. Even with a broad reading of purchase and sale, it is plain that "the mere retention of securities will not satisfy the 'in connection with' requirement." *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 100 (S.D.N.Y.1976). In other words, if misrepresentations are made

which cause the plaintiff to retain stock, rather than buy or sell, these misrepresentations are not actionable under Rule 10b–5. *Id.* Of the three alleged misrepresentations, only the following three can be construed to be in connection with Plaintiffs' purchases of CES and Spectratek: (1) statements concerning EAC, (2) statements that Spectratek and CES were "hot on the market", and (3) statements that CES and Spectratek could do as well as the money market.

■ Therefore, the court must determine whether these three statements constituted material misrepresentations. A statement is a misrepresentation if it is false or misleading. *See Utah v. Lefevre,* 825 P.2d 681, 687 (Utah Ct.App.1992). To this end, the court makes the following findings. Nelson's statement that the stock was just as good as EAC and that it was hot on the market are classic opinions which do not rise to the level of a misrepresentation. *See Black v. Riker–Maxson Corp.,* 401 F.Supp. 693, 699 (S.D.N.Y.1975). Statements of opinion predicting future success and based on historical and factual bases are not actionable under Rule 10b–5. *See In re Apple Computer Securities Litigation,* 672 F.Supp. 1552, 1563 (N.D.Cal. 1987), *modified,* 886 F.2d 1109 (9th Cir. 1989), *cert. denied sub nom., Schneider v. Apple Computer, Inc.,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Similarly, Nelson did not guarantee results by representing that the stock *would* do as well as the money market, rather he represented that the stock *could* do as well as the money market. *Black,* 401 F.Supp. at 699. This statement was an opinion based on Nelson's knowledge of the industry and the past performance of stocks in that industry. Consequently, it does not constitute a misrepresentation. Therefore, Nel-

---

**13.** Plaintiffs also contend that Nelson misrepresented EAC's public offering, thereby inducing them to open their trust accounts. Even if Nelson did misrepresent EAC's public offering, a fact the court does not find, such a misrepresentation is not actionable under Rule 10b–5. "[M]isrepresentations made by brokers inducing the opening of an account are not actionable under the federal securities law." *Bischoff v.*

*G.K. Scott & Co.,* 687 F.Supp. 746, 749 (E.D.N.Y. 1986).

**14.** Plaintiffs also cite Nelson's advice to Plaintiffs to supply false addresses and assert that this bears on his credibility. It does, and the court has considered this fact in reaching its findings.

son and the other Defendants did not violate Rule 10b–5 in connection with the Plaintiffs' purchase and sale of CES and Spectratek.

■ The analysis must proceed, however, with respect to Mary Marchese's purchase of VET. Two representations are pertinent to this purchase: (1) Nelson's January 1985 letter; and (2) Nelson's telephone calls concerning the status of Mary Marchese's account. Mary Marchese contends that these positive reports induced her to purchase VET. Nelson's January 1985 letter serves as a general letter to his clients, rather than as a specific assessment of Mary Marchese's account. Again, the letter is a statement of opinion based on historical data. Thus, the letter did not constitute a misrepresentation of fact. However, the court agrees that Nelson's representations that the stock was doing fine and making money, when in fact they were doing neither, were misrepresentations that induced Mary Marchese to purchase VET.

Further, these misrepresentations were material. The Utah Court of Appeals recently set forth the standard for assessing the materiality of a misrepresentation: "Materiality seems to require that the victim to some extent must believe the pretense to be true, but the greater focus is the objective issue of whether the misrepresentation was instrumental" in the decision to purchase the stock. *Utah v. LeFevre*, 825 P.2d 681, 687 (Utah Ct.App. 1992).[15] Phrased differently, the representation is material "if the victim believed the misrepresentation to be true, and included it as a factor in the decision-making process." *Id.* (footnote omitted). Because these representations induced Mary Marchese to purchase VET, the court finds that they were material.

■ Further, Mary Marchese justifiably relied on Nelson's statement. "[A] plaintiff may not justifiably rely on a misrepresentation where its falsity is palpable. This is another way of saying that the

defendant's wrong must have been the cause of the plaintiff's harm." *Holdsworth v. Strong*, 545 F.2d 687, 694 (10th Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). The difficulty is that Mary Marchese did not receive her first statement until March 1985. Consequently, she had nothing on which to base the value of her account, but on Nelson's statements. Accordingly, she acted reasonably in relying on Nelson's statements.

■ Finally, the court must determine whether Nelson acted with intent to defraud. A successful claim under Rule 10b–5 requires proof that the defendant intended to deceive, manipulate, or defraud. *See Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The scienter requirement necessary to impose liability under Rule 10b–5 is something less than specific intent and something more than mere negligence. *See Oleck v. Fischer*, 401 F.Supp. 651, 656 (S.D.N.Y.1975). When a defendant has actual knowledge that the statements were false or that material facts were omitted, he has acted with the requisite scienter. *See Fishman v. Estrin*, 501 F.Supp. 208 (D.D.C.1980). Statements of opinion predicting future success and based on historical and factual bases are not actionable under Rule 10b–5. *See In re Apple Computer Securities Litigation*, 672 F.Supp. at 1563.

■ Nelson's representations fall into this category, and consequently, the court finds that he did not have the intent to defraud Mary Marchese. Nelson was an inexperienced salesperson. Although inexperience does not justify misrepresentation, he closely followed his superior's advice when conveying the value of an account: give bid and asked price. Given the context, Nelson's misrepresentation, although not justified, was not intentional. Consequently, the court finds that Defendants have not violated Rule 10b–5 and that

---

**15.** *LeFevre* is a criminal case. Nevertheless, the court finds that standard for materiality set forth in *LeFevre* applies in the civil context.

Plaintiffs are not entitled to recovery under this claim.

## B. Fraud

Plaintiffs claim that the same alleged misrepresentations set forth in the discussion of Rule 10b–5 constitute common law fraud. The Utah Supreme Court has set forth the following elements of common law fraud:

(1) That a representation was made;

(2) concerning a presently existing material fact;

(3) which was false;

(4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he [or she] had insufficient knowledge upon which to base such representation;

(5) for the purpose of inducing the other party to act upon it;

(6) that the other party, acting reasonably and in ignorance of its falsity;

(7) did in fact rely upon it;

(8) and was thereby induced to act;

(9) to his [or her] injury and damage.

*Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991) (quoting *Pace v. Parrish*, 122 Utah 141, 247 P.2d 273, 274–75 (1952)).

As seen, the essential elements of common law fraud mirror the elements of Rule 10b–5. Unlike Rule 10b–5, however, the scope of common law fraud reaches beyond misrepresentations made in connection with the sale or purchase of stock, to include any misrepresentations, made at any time. Consequently, plaintiffs' fraud allegations include not only Nelson's statements at the time Plaintiffs purchased CES and Spectratek, but also Nelson's statements regarding the public offering of EAC, Nelson's January letter, and his statements regarding the continued progress of Plaintiffs' accounts.

 The court previously stated in its discussion of Rule 10b–5, but will clarify again, neither Nelson's statements regarding the EAC public offering,[16] his state-

ments made at the time Plaintiffs purchased CES and Spectratek, nor his January 1985 letter were misrepresentations. Accordingly, the court finds no fraud with respect to these allegations. As under Rule 10b–5, however, the court finds that Nelson's statements concerning the progress of Plaintiffs' accounts did misrepresent the true facts. Many of the elements of common law fraud are present with respect to these misrepresentations. Clearly, the statements were false representations concerning then existing facts. Plaintiffs relied on these misrepresentations and were, thereby, induced to maintain their accounts. In the case of Mary Marchese, her reliance on Nelson's misrepresentations, induced her to purchase VET. Further, Plaintiffs' reliance led to their monetary damage.

The court, however, does not find Nelson liable to Plaintiffs for common law fraud, because Plaintiffs have failed to establish two essential elements of common law fraud: (1) justifiable reliance and (2) intent. Like Rule 10b–5, a plaintiff's reliance on a misrepresentation must be justified. "[T]he defendant's wrong must have been the cause of the plaintiff's harm." *Holdsworth v. Strong*, 545 F.2d 687, 694 (10th Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). "Reasonable reliance must be considered with reference to the facts of each case." *Conder v. A.L. Williams & Assoc.*, 739 P.2d 634, 638 (Utah Ct.App.1987) (citation omitted). "[A] plaintiff may justifiably rely on positive assertions of fact without independent investigation." *Id.* (citations omitted).

It is only where, under the circumstances, the facts should make it apparent to one of his knowledge and intelligence, or he has discovered something which should serve as a warning that he is being deceived, that a plaintiff is required to make his own investigation.

*Id.* (citation omitted).

Applying this standard for justifiable reliance, it is plain, and the court so finds,

---

**16.** To clarify the record, Nelson had no control whether EAC did or did not go public and was under a reasonable belief that EAC would go public when he so represented to Plaintiffs. Consequently, the court finds no misrepresentations concerning the EAC public offering.

that Plaintiffs' reliance on Nelson's statements made after Plaintiffs received their statements was not justified. Plaintiffs, though inexperienced in securities investment, are intelligent, thoughtful people with some college education. Further, the account statements were not cryptic. Plaintiffs' statements were no more difficult to read than a credit card statement. When Plaintiffs received a statement which reflected an account balance below their original investment, they were put on notice of a potential problem, and therefore, were not justified in relying on Nelson's statements that their accounts were progressing and making money.[17]

Neither does the court find that Nelson intended to misrepresent the true facts. To satisfy the element of intent, the plaintiff must show that the representations were known to be false or were made when the representor knew he had insufficient information. *Id.* The intent standard for common law fraud, like the intent standard for Rule 10b–5, encompasses both specific intent and recklessness. *See Oleck v. Fischer*, 401 F.Supp. 651, 656 (S.D.N.Y. 1975) (scienter requirement necessary to impose liability under Rule 10b–5 is something less than specific intent and something more than mere negligence).[18] To repeat the court's earlier finding, Nelson, at the time of these transactions, was an inexperienced salesperson who closely followed his employer's instructions. His actions were neither intentional nor reckless. Consequently, Plaintiffs may not recover for common law fraud.

### C. Negligent Misrepresentation

Plaintiffs base their negligent misrepresentation claims on the same alleged mis-

representations discussed in the fraud section. Because "[n]egligent misrepresentation is a form of fraud," the court will not discuss each element of the claim at length. *Atkinson v. IHC Hosp., Inc.*, 798 P.2d 733, 737 (Utah 1990) (citation omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991). Nonetheless, to prevail on this claim, Plaintiffs must establish that

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by the justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* (quoting Restatement (Second) of Torts § 552 (1977)).

The critical distinction between fraud and negligent misrepresentation is the element of intent.

> The negligent representer [sic] need not be shown to have any intent to deceive the victim, and he generally does not demonstrably know that what he says is false. The law imposes on him the duty to reasonably assure the accuracy of what he represents, because of his superior position to obtain the needed knowledge and his pecuniary interest in the transaction.

*Galloway v. Afco Dev. Corp.*, 777 P.2d 506, 509 (Utah Ct.App.1989) (footnote omitted). Accordingly, Plaintiffs must show that Nelson had a duty to assure the accuracy of his representations and that he breached

---

**17.** To clarify the court's finding, Plaintiffs received their initial account statements as follows: Kent Minor—April 1985; Frank Marchese—November 1984; Mary Marchese and Rosemary Orbegoso—March 1985. Plaintiffs did not justifiably rely on misrepresentations concerning the progress of their accounts made after these respective dates.

**18.** In cases where a confidential relationship exists between the parties, "[t]he breach of duty by the dominant party ... may be regarded as

constructive fraud." *Blodgett v. Martsch,* 590 P.2d 298, 302 (Utah 1978). In such a case, "[i]t is unnecessary for the plaintiff to show an intent to defraud." *Id.* "There are a few relationships (such as parent-child, attorney-client, trustee-cestui) which the law presumes to be confidential." *Id.* As set forth in the court's discussion of the claim for breach of fiduciary duty, *infra* pages 894–895, under Utah law, a stock salesperson over a non-discretionary account is not a fiduciary. Therefore, Nelson owed no fiduciary duty to Plaintiffs.

this duty. The Utah Supreme Court has described this duty:

> If ... the information is given in the capacity of one in the business of supplying such information, that care and diligence should be exercised which is compatible with the particular business or profession involved. Those who deal with such persons do so because of the advantages which they expect to derive from this special competence. The law, therefore, may well predicate on such a relationship, the duty of care to insure the accuracy and validity of the information.

*Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah 1983) (citation omitted). Further, as with any tort, Plaintiffs must show materiality and justifiable reliance. *Atkinson*, 798 P.2d at 737.

■ Concerning Plaintiffs' fraud claims, the court found that neither Nelson's statements regarding the EAC public offering, his statements made at the time Plaintiffs purchased CES and Spectratek, nor his January 1985 letter were misrepresentations. *Supra* page 890. Thus, the court found no fraud with respect to these allegations. *Id.* However, the court did find that Nelson's statements concerning the progress of Plaintiffs' accounts did misrepresent the true facts. *Id.* Many of the elements of common law fraud are present with respect to these misrepresentations. Clearly, the statements were false representations concerning then existing facts. Plaintiffs, relying on these misrepresentations, were induced to maintain their accounts, and in the case of Mary Marchese, purchased VET in reliance on Nelson's misrepresentations. Further, Plaintiffs' reliance led to their monetary damage.

Consequently, having determined that Nelson did misrepresent certain facts, whether he is liable to Plaintiffs for negligent misrepresentation turns on whether these misrepresentations were made negligently. In turn, whether the misrepresentations were made negligently turns on whether Nelson had a duty to Plaintiffs to insure the accuracy and validity of his statements. The court finds such a duty. Nelson possessed both a superior position to obtain information regarding the values of the Plaintiffs' accounts and also a pecuniary interest in the transactions. This superior position, by his own admission, imposed upon him a duty to accurately report to Plaintiffs the value of their accounts. Having failed to make an accurate report, Nelson breached his duty to Plaintiffs.

■ Having found negligent misrepresentations, the scope of Nelson's liability turns on the extent to which Plaintiffs justifiably relied on the misrepresentations. The court previously discussed justifiable reliance and found that Plaintiffs' reliance on Nelson's statements made after Plaintiffs received their statements was not justified. *Supra* pages 890–891. The court reasoned that Plaintiffs, though inexperienced in securities investment, are intelligent, thoughtful people with some college education. *Id.* Further, the account statements were not cryptic. *Id.* Plaintiffs' statements were no more difficult to read than a credit card statement. *Id.* When Plaintiffs received a statement which reflected an account balance below their original investment, they were put on notice of a potential problem, and therefore, were not justified in relying on Nelson's statements that their accounts were progressing and making money. *Id.*

■ Therefore, Nelson, through negligent misrepresentation, is liable to Plaintiffs for damages; however, his liability is limited to those losses which Plaintiffs incurred prior to the time they received their first account statements, because Plaintiffs justifiably relied on these misrepresentations. Nelson is not liable for losses arising after Plaintiffs received their first account statements, because the account statements allowed Plaintiffs to ascertain the value of their account from an understandable source.

### D. Breach of Fiduciary Duty

Plaintiffs contend that a fiduciary relationship existed between them and Nelson and that Nelson violated this relationship.

They allege numerous violations: (1) improper self-dealing; (2) failing to properly advise Plaintiffs and intentionally misinforming Plaintiffs; (3) failing to properly administer Plaintiffs' accounts; (4) failing to properly invest Plaintiffs' funds; and (5) failing to make satisfactory explanations for losses Plaintiffs suffered. Analysis of Plaintiffs' contentions involves a two-part inquiry: first, whether, as a matter of law, a fiduciary relationship existed between Nelson and Plaintiffs; and second, assuming the existence of a fiduciary relationship, whether, on the given facts and contentions, Nelson violated his duty to Plaintiffs.

"The question of whether a fiduciary relationship exists is a question of state law." *Davis v. Merrill, Lynch, Pierce, Fenner & Smith,* 906 F.2d 1206, 1215 (8th Cir.1990). Because neither the Utah legislature nor its courts have decided whether a fiduciary relationship exists between a securities broker and his clients,[19] this court must determine how the Utah Supreme Court might resolve the question. *See Davis,* 906 F.2d at 1215. Although not dispositive of the question, numerous courts have addressed the question and provide guidance to this court in making its determination.

Unlike the present case which involves nondiscretionary accounts, "the broker handling a discretionary account becomes the fiduciary of his customer in a broad sense." *Leib v. Merrill, Lynch, Pierce, Fenner & Smith,* 461 F.Supp. 951, 953 (E.D.Mich.1978) (interpreting Michigan law). Accordingly, numerous courts have held that the lodestar for determining the existence of a fiduciary relationship is whether the account is discretionary or nondiscretionary. *See, e.g. Refco, Inc. v. Troika Inv. Ltd.,* 702 F.Supp. 684, 687 (N.D.Ill.1988) (interpreting Illinois law). In *Refco,* the court held that "[i]n general only a broker operating a discretionary account

is viewed as a fiduciary." *Id.* at 686. The *Refco* court tempered its absolute view by acknowledging that "[e]ven in the most limited type of agency—the nondiscretionary account where the broker is simply called on to carry out its principal's orders—the concept of faithfulness to duty operates to preclude the agent's dealing to its own advantage rather than its principal's." *Id.* at 687 n. 9.

Similarly, in *Leib,* the court indicated that in a nondiscretionary account, the "broker is bound to act in the customer's interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed." *Leib,* 461 F.Supp. at 952–53. Notwithstanding this apparently limited duty, the *Leib* court identified six duties associated with nondiscretionary accounts: (1) the duty to recommend stock only after becoming informed about the stock; (2) the duty to promptly carry out the customer's orders; (3) the duty to inform the customer of the risks involved in a transaction; (4) the duty to refrain from self-dealing; (5) the duty not to misrepresent any fact material to a transaction; and (6) the duty to transact business only after prior authorization from the customer. *Id.* at 953.

The Tenth Circuit, rather than using the nature of the account as the dispositive factor, balanced the nature of the account with the nature of the relationship between the parties. *Hotmar v. Listrom & Co.,* 808 F.2d 1384, 1386 (10th Cir.1987) (interpreting Kansas law). The *Hotmar* court, in finding no fiduciary relationship, analyzed whether the broker agreed to manage or otherwise control the account, or rather, whether he merely rendered advice. *Id.* at 1387. Finding no agreement by the broker to monitor his clients' nondiscretionary accounts, the court found no fiduciary relationship. *Id.*

---

**19.** Utah courts have discussed the nature of the relationship between a real estate agent and a potential buyer:

"Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor [or a purchaser] is expected to be honest, ethical, and competent

and is answerable at law for breaches of his or her statutory duty to the public." *Rogers v. Division of Real Estate,* 790 P.2d 102, 107 (Utah Ct.App.1990) (quoting *Dugan v. Jones,* 615 P.2d 1239, 1248 (Utah 1980), *aff'd on rehearing,* 724 P.2d 955 (Utah 1986)).

Other courts have rejected the nondiscretionary-discretionary dichotomy, in favor of an analysis of the actual relationship. *See, e.g. Baker v. Wheat First Sec.*, 643 F.Supp. 1420, 1429 (S.D.W.Va.1986) (interpreting West Virginia law); *Davis v. Merrill, Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1216–17 (8th Cir.1990) (interpreting South Dakota law). In so doing, the *Baker* court found a fiduciary relationship where the broker exerted "de facto control" over the account. *Baker*, 643 F.Supp. at 1429. To the *Baker* court, such de facto control existed when " 'the client routinely follows the recommendations of the broker.' " *Id.* (quoting *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 821 (9th Cir.1980)).

The Eighth Circuit in *Davis* followed the rationale of the *Baker* court, concluding that a fiduciary relationship may exist in cases where the broker exerts de facto control over a nondiscretionary account. *Davis*, 906 F.2d at 1216–17. In reaching this result, the *Davis* court relied heavily on the fact that the aggrieved customer was an unsophisticated investor who never failed to follow her broker's recommendations. *Id.* at 1217. Even then, however, the court found it significant that the broker had made numerous unauthorized trades. *Id.*

Finally, other courts assume the existence of a fiduciary relationship even if the account is discretionary, and then analyze the facts to determine the scope of the duty and whether the broker breached the duty. *See, e.g., Romano v. Merrill, Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir.1987) (interpreting federal securities law). Applying this analysis, the *Romano* court found no breach where the customer, an alert and vigilant businessman, controlled his nondiscretionary account and made all decisions regarding activity in the account. *Id.* (citations omitted).

The cases discussed above illustrate four methods that courts employ in answering whether a fiduciary relationship exists between a broker and a customer with nondiscretionary accounts. Two of these methods involve an absolute rule: either finding no fiduciary relationship because the account is nondiscretionary, *see Refco, Inc. v. Troika Inv. Ltd.*, 702 F.Supp. 684, 687 (N.D.Ill.1988), or finding a fiduciary relationship regardless of whether the account is discretionary, *see Romano v. Merrill, Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir.1987). Other courts, using a flexible approach, base the existence of a fiduciary relationship, not on the nature of the account, but on the nature of the relationship, and find a fiduciary relationship either if the broker has agreed to manage the account, *see Hotmar v. Listrom & Co.*, 808 F.2d 1384, 1386 (10th Cir.1987), or if the broker exercises de facto control over the account, *see Davis v. Merrill, Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1216–17 (8th Cir.1990).

■ In assessing which method the Utah Supreme Court, if faced with the identical question, would follow, this court believes that an absolute rule is not appropriate. In practice, the existence of a fiduciary relationship cannot be based merely on whether the customer's account is discretionary or nondiscretionary. Accordingly, this court rejects the rules announced in *Refco* and in *Romano*. Further, the court believes that the de facto rule of *Davis* places too much reliance on the relationship and has the potential fault of placing an unreasonable burden on brokers. Therefore, the court concludes that the *Hotmar* rule is better reasoned and would be adopted by the Utah courts.

Using the *Hotmar* rule, the court conducts a two-part inquiry. The first part queries whether the account is discretionary or nondiscretionary. If discretionary, a fiduciary relationship exists; if nondiscretionary, the court proceeds to the second part of the inquiry. In the second part of the analysis, the court queries whether the broker has merely offered advice or whether he has agreed to manage the account. If the broker has agreed to manage the account, a fiduciary relationship exists.

■ Applying the *Hotmar* rule to the present case, the court concludes as a matter of law that no fiduciary relationship existed between Nelson and Plaintiffs.

Plaintiffs' accounts were nondiscretionary. Although the nature of the account alone is not dispositive, it is a significant factor. Further, the record contains no evidence that Nelson agreed to manage Plaintiffs' accounts. He merely offered advice. Thus, the two significant indicators, the nature of the account and the relationship of the parties, both indicate that Nelson did not have a fiduciary relationship with Plaintiffs. Consequently, Nelson is not liable to Plaintiffs for breach of fiduciary duty.

The court is not unaware of *Rogers v. Division of Real Estate*, 790 P.2d 102, 107 (Utah Ct.App.1990). In *Rogers,* the Utah Court of Appeals discussed the relationship between a real estate agent and a potential buyer:

> "Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor [or a purchaser] is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public."

*Rogers v. Division of Real Estate,* 790 P.2d 102, 107 (Utah Ct.App.1990) (quoting *Dugan v. Jones,* 615 P.2d 1239, 1248 (Utah 1986), *aff'd on rehearing,* 724 P.2d 955 (Utah 1986)). *Rogers* could be extended to apply to stock brokers. However, because the stock broker-customer relationship differs significantly from the real estate broker-buyer relationship, this court believes that Utah courts would be reluctant to extend *Rogers.*

However, even if *Rogers* did apply, this court would not find that Nelson breached his duty to Plaintiffs. In *Rogers,* the court stopped short of finding a fiduciary relationship, but nonetheless, imposed limited duties on the real estate broker. In this regard, *Rogers* is analogous to *Leib,* in which the court, addressing the duties of a broker over a nondiscretionary account, stated that "broker is bound to act in the customer's interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed." *Leib,* 461 F.Supp. at 952–53. The *Leib* court identified six duties of the broker: (1) the duty to recommend stock only

after becoming informed about the stock; (2) the duty to promptly carry out the customer's orders; (3) the duty to inform the customer of the risks involved in a transaction; (4) the duty to refrain from self-dealing; (5) the duty not to misrepresent any fact material to a transaction; and (6) the duty to transact business only after prior authorization from the customer. *Id.* at 953.

Without a lengthy explication of each duty, the court finds that Nelson did not violate any of these limited duties. He informed himself about the stocks he suggested to Plaintiffs and also informed Plaintiffs about the risks associated with the stocks. He promptly carried out Plaintiffs' orders, did not make unauthorized trades, and did not engage in self-dealing. Furthermore, although the court has found that Nelson negligently misrepresented material facts to Plaintiffs, none of these misrepresentations occurred in connection with a stock transaction. Consequently, even if Nelson had limited duties to Plaintiffs, the court does not find that he breached any of these duties.

### E. Joint Liability

█ Plaintiffs seek recovery from Nelson's employers at the time of the dispute, Main Street Securities and Equity One under the doctrine of respondeat superior. "'The well-settled rule is that a principal [employer] is liable civilly for the tortious acts of his agent [employee] which are done within the course and scope of the agent's employment.'" *Phillips v. JCM Dev.,* 666 P.2d 876 (Utah 1983) (quoting 3 Am.Jur.2d *Agency* § 267 (1963)). Because of the small sums at issue in this matter, neither Main Street Securities nor Equity One appeared at trial, choosing to accept a default rather than to incur additional expense.

In *Phillips,* the Utah Supreme Court upheld a trial court's finding that the tortious conduct of a real estate agent could be imputed to his broker if the torts were committed during the course of and within the scope of the agent's employment. *Id.* at 882–83. This is court is also persuaded, and so finds, that Nelson's negligent mis-

representations arose during the course of and within the scope of his employment with both Main Street and Equity One. Witnesses from each organization testified concerning Nelson's training and his favorable work history. Consequently, both Main Street and Equity One must share, under the doctrine of respondeat superior, in the liability to Plaintiffs for the negligent misrepresentations of Nelson.

In so finding, the court is careful to clarify the respective liability of Main Street and Equity One. Nelson began with Equity One in January 1985. By this time all the disputed transactions had occurred except Mary Marchese's January 1985 purchase of $3200 worth of VET. This is the only transaction for which Equity One can reasonably be held accountable. Consequently, Equity One's liability is limited, as clarified hereafter, to $3200.

### F. Damages

The court has found that Nelson negligently misrepresented material facts to Plaintiffs and that Plaintiffs were damaged as a result of these misrepresentations. Therefore, Plaintiffs are entitled to recover for a portion of their damages. To calculate recovery in a negligence action, Utah applies the doctrine of modified comparative negligence. Under this doctrine, a plaintiff may recover "from any defendant or group of defendants whose fault exceeds his own." Utah Code Ann. § 78–27–38 (1992). Thus, a plaintiff's recovery is reduced by the percentage of his fault, unless his negligence exceeds the defendants' negligence, in which case the plaintiff may not recover.

Prior to receipt of their first statements, Plaintiffs bore no responsibility for their damages. Nelson, therefore, must bear 100% of Plaintiffs' losses up to the time that Plaintiffs received their first statements. Thereafter, however, Plaintiffs' fault exceeds that of Nelson. The court reaches this conclusion, because Plaintiffs were in possession of information in their statements that would have apprised them of the status of their accounts, and therefore, they did not justifiably rely on Nelson's misrepresentations. Therefore, Plaintiffs may not recover for losses suffered after receipt of their first statements.

Damages are based on the following investments. Mary Marchese initially contributed $3,347.90 to a trust account in May and June 1984. Pl.'s Ex. 31 at 1. She invested $2068 in August 1984: $1088 in CES and $980 in Spectratek. Pl.'s Ex. 31. at 2. In February 1985, she purchased an additional $3200 in VET. Pl.'s Ex. 31 at 4. Thus, she invested $5268. When she received her first statement for the period ending March 29, 1985, her account value was $3,217.60. *Id.* Thus, her total recoverable loss as a result of Nelson's misrepresentations was $2,050.40.

Mary Marchese's loss should be apportioned as follows. Nelson and Main Street are jointly liable for $850.40. This figure represents the loss she suffered on investments purchased while Nelson worked for Main Street. Nelson and Equity One are jointly liable for $1200. This $1200 figure represents the value of VET as reflected in Mary Marchese's first statement. Pl.'s Ex. 31 at 3.

Rosemary Marchese Orbegoso initially invested $2000 in a trust account in April 1984. Pl.'s Ex. 1 at 2. This accrued interest so that her initial stock investment in August 1984 totalled $2015: $1088 in CES and $927 in Spectratek. Pl.'s Ex. 1 at 3. When Rosemary's mother received Rosemary's first account statement for the period ending March 29, 1985, Rosemary's account value was $1085.01, a loss of $929.99. Pl.'s Ex. 1 at 5. She is entitled to recover this amount.

Kent Minor initially invested $2000 in a trust account in April 1984. Pl.'s Ex. 7 at 1. The record does not indicate what portion of this $2000 he invested in CES and Spectratek in August 1984. When he received his first account statement for the period ending March 29, 1985, Minor's account value totalled $1255.91. Pl.'s Ex. 7 at 2. Therefore, he has suffered a recoverable loss of $744.09.

Frank Marchese initially invested $3083.03 in a trust account during May and June 1984. Pl.'s Ex. 49 at 1. Of this

amount, he invested $2066 in August 1984 in CES and Spectratek: $1088 in CES and $980 in Spectratek. Pl.'s Ex. 49 at 2. When Frank Marchese received his first statement for the period ending September 28, 1984, the value of CES and Spectratek had declined to $400, a loss of $1666. Pl.'s Ex. 49 at 3. When Frank Marchese received his March 29, 1985 statement, the value of CES and Spectratek had rebounded to $1100: $800 for CES and $300 for Spectratek. Pl.'s Ex. 49 at 6. Nelson cannot be held accountable for any loss after this time. Consequently, this $1666 loss must be reduced by $700 to $966. Nelson and Main Street are jointly liable to Frank Marchese for this amount.

Plaintiffs seek, but have not pled, punitive damages. Therefore, they are not entitled to an award of punitive damages. However, even if Plaintiffs had properly pled punitive damages, the court would not award them, because Plaintiffs have not established, and the court does not find, that Nelson acted either intentionally or recklessly.

■ Plaintiffs seek a pre-judgment interest rate of 10%. Although federal law may govern pre-judgment interest in a federal question case, see Amoco Prod. Co. v. United States, 663 F.Supp. 998 (D.Utah 1987), aff'd, 852 F.2d 1581 (10th Cir.1988), because Plaintiffs have prevailed only on one state law claim, pre-judgment interest will be calculated by state law, see Loft v. Lapidus, 936 F.2d 633 (1st Cir.1991). The current pre-judgment interest rate established under Utah law is 10%. See Utah Code Ann. § 15–1–1 (1988). This rate shall apply to Plaintiffs' recovery.

■ Pre-judgment interest shall be calculated from the approximate date that Plaintiffs received their first account statements. Mary Marchese and Rosemary Marchese Orbegoso shall receive interest on their award from March 1, 1985. Interest shall be calculated on Kent Minor's award from April 1, 1985 and on Frank Marchese's award from November 1, 1984.

■ Plaintiffs seek post-judgment interest calculated at 12% as provided by state law. Federal law, rather than state law, governs post-judgment interest. See Everaard v. Hartford, 842 F.2d 1186 (10th Cir.1988). Title 28, section 1961(a) of the United States Code establishes the following rate of post-judgment interest:

> Such interest shall be calculated from the date of the entry of judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment.

This rate is currently 3.72% and shall be computed daily and compounded annually, see 28 U.S.C. § 1961(b) (1988).

Plaintiffs are not entitled to attorney's fees and must bear their own costs.

### III. CONCLUSION

Plaintiffs' Rule 10b–5, common law fraud, negligent misrepresentation, and breach of fiduciary duty claims were tried to the court on July 6 and 7, 1992. The court has reached the following conclusions of law and findings of fact.

The court first has found that Nelson did not violate Rule 10b–5. In bringing their Rule 10b–5 claim, Plaintiffs have alleged that Nelson committed five discrete misrepresentations. The court has found that only three of these alleged misrepresentations happened in connection with the sale of securities, and hence, are potentially actionable under Rule 10b–5. Further, in assessing, these three statements, the court found that they did not constitute misrepresentations, but rather were statements of opinion, which are not actionable under Rule 10b–5. However, the court did find, that as to Mary Marchese, certain of Nelson's statements were material misrepresentations on which she justifiably relied. The court, however, did not find that Nelson acted either recklessly or intentionally in making these misrepresentations. Consequently, Mary Marchese has no cause of action against Nelson under Rule 10b–5.

Plaintiffs also alleged that the same misrepresentations constituted common law

fraud. Of these statements, the court has found that Nelson's statements regarding the success of Plaintiffs' accounts were misrepresentations. The court has found, however that these misrepresentations are not actionable, because Plaintiffs' did not justifiably rely on the misrepresentations after they received their first account statements, and because Nelson did not intentionally misrepresent the truth.

Concerning Plaintiffs' negligent misrepresentation claims, the court has found all of the elements. Crucial to the court's finding is it conclusion that Nelson had a duty to ensure the validity and accuracy of his statements to Plaintiffs regarding the progress of their accounts. Nelson's statements were neither valid nor accurate; therefore, he breached his duty to Plaintiffs. Consequently, Plaintiffs are entitled to recover from Nelson for his negligent misrepresentations.

Plaintiffs' final claim alleges that Nelson breached his fiduciary duty to Plaintiffs. Without the benefit of Utah law directly on point, the court has analyzed case law from other jurisdictions. After careful examination of this authority, the court has concluded that Nelson did not have a fiduciary relationship with Plaintiffs, because Plaintiffs' account were nondiscretionary, and because Nelson did not agree to manage Plaintiffs' accounts. However, even if Nelson did have a fiduciary relationship with Plaintiffs, this duty was limited. Having overlaid the present fact upon this limited duty, the court has found that, even if limited duties applied, Nelson did not breach these duties. Consequently, Plaintiffs may not recover against Nelson for breach of fiduciary duty.

Plaintiffs bring their claims against Nelson and his former employers, Main Street Securities and Equity One, neither of which have presented a defense. Notwithstanding their silence, the court has carefully analyzed whether Nelson's former employers should share in his liability. As a matter of law, employers are liable for the torts of their employees that are done within the course and the scope of employment. The court has found that Nelson's negligent conduct did arise within the scope and the course of his employment. Hence, Main Street Securities and Equity One are jointly liable with Nelson. Because only Mary Marchese's purchase of VET occurred while Nelson was employed with Equity One, Equity One's liability is limited to $1200, the value of VET when Mary Marchese received her first statement.

In establishing damages, the court has carefully analyzed the evidence. The court has relied heavily on Plaintiffs' account statements which clearly indicate the amount of Plaintiffs' investments and the value of Plaintiffs' accounts on the pertinent dates. In analyzing the evidence, the court has found that Plaintiffs were not justified in relying on Nelson's misrepresentations after they received their first account statements; and therefore, Nelson is not liable for these losses.

The court has found Nelson and Main Street Securities jointly liable for the following damages: (1) to Mary Marchese for $850.40 in damages; (2) to Rosemary Orbegoso for $929.99 in damages; (3) to Kent Minor for $744.09 in damages; and (4) to Frank Marchese for $966 in damages. Additionally, Nelson and Equity One are jointly liable to Mary Marchese for $1200 in damages.

Plaintiffs are not entitled to punitive damages, attorney's fees or costs. They are, however, entitled to pre-judgment interest at the Utah statutory rate of 10% beginning on the approximate date that they received their first account statements, which was the date when Plaintiffs' causes of action accrued. Plaintiffs also are entitled to post-judgment interest at the federal statutory rate of 3.72%. IT IS SO ORDERED.